# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 25, 2016 Session

## BOBBY McBEE v. CSX TRANSPORTATION, INC.

**Appeal from the Circuit Court for Shelby County**
**No. CT-003118-10     Robert Samual Weiss, Judge**

---

**No. W2015-01253-COA-R3-CV – Filed February 24, 2017**

---

This appeal arises from a negligence action filed by the plaintiff employee in June 2010, pursuant to the Federal Employer Liability Act ("FELA"), *see* 45 U.S.C. §§ 51-60 (2012), against his former employer, the defendant railroad.  The employee, who had worked for the railroad for thirty-nine years in a variety of positions, alleged that he suffered bilateral rotator cuff tears as a result of the railroad's negligence in failing to provide him with proper equipment while he worked as a foreman flagman from January 2007 through March 2009.  In February 2012, the railroad filed a motion for summary judgment based on the three-year statute of limitations provided in 45 U.S.C. § 56.  Following a hearing, the trial court denied the motion in April 2012 but stated that it would reconsider if presented with additional evidence.  The railroad subsequently filed additional motions for summary judgment in January 2014, reasserting the statute-of-limitations defense and asserting that the employee could not prove his claim due to an alleged lack of expert testimony regarding medical causation and an alleged inability to demonstrate the railroad's liability through expert testimony.  Following a hearing, the trial court denied the motions for summary judgment as to the statute of limitations and medical causation.  The court, however, granted summary judgment in favor of the railroad based on the employee's lack of expert testimony regarding liability.  The employee has appealed the judgment, and the railroad has raised an issue regarding the statute of limitations.  Having determined that under the circumstances of this action, the employee presented evidence that created a material factual dispute as to whether the railroad negligently contributed to his injuries, we reverse the trial court's grant of summary judgment.  We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Eugene A. Laurenzi and Jessica Bradley, Memphis, Tennessee, for the appellant, Bobby McBee.

S. Camille Reifers and Brooks E. Kostakis, Memphis, Tennessee, for the appellee, CSX Transportation, Inc.

**OPINION**

I. Factual and Procedural Background

The plaintiff, Bobby McBee, was employed by the defendant, CSX Transportation, Inc. ("CSX"), from 1970, two years after he graduated from high school, through 2009. Mr. McBee held several positions with CSX, typically remaining in each job for two to four years before exercising his seniority to take a new position or accepting a different position when another employee successfully exercised seniority to "roll" into the job Mr. McBee held at the time. According to Mr. McBee's deposition testimony, during the thirty-nine years he was employed by CSX, he worked successively as a track repairman (1970-1972), tractor machine operator (1972), assistant foreman over a rail gang (1972-1973), foreman over a spot-tamping gang (1973-1975), track bolt machine operator (1975-1976), foreman over a spot-tamping gang (1976-1978), track inspector (1978-1980), track repairman with a section gang (1980-1983), track repairman with a tamping gang (1983-1987), foreman over a section gang (1987-1991), foreman flagman (1991-1993), foreman over a section gang (1993-1997), track inspector (1997-2000), foreman over a tamping gang (2000-2007), and foreman flagman (2007-2009).

Mr. McBee's last day of work for CSX was March 27, 2009, at which time he was released on medical leave to undergo surgery on his left shoulder, including repair of a torn rotator cuff, on March 30, 2009. He then underwent surgery on his right shoulder, again including repair of a torn rotator cuff, on August 7, 2009. Mr. McBee subsequently applied for retirement benefits from CSX on August 18, 2009, officially retiring from his employment at the age of sixty on September 30, 2009.

Mr. McBee initially sought treatment for intermittent pain in his shoulders in 1999 and then again in 2004 and 2005, obtaining diagnoses of degenerative joint disease and arthritis from his family physician, Dr. W. Hardin Coleman, Jr.[1] Although Mr. McBee

---

[1] Dr. W. Hardin Coleman, Jr., testified by deposition that he had begun seeing Mr. McBee as a family medicine practitioner in 1998. Dr. Coleman also explained that his father, Dr. Coleman, Sr., previously had practiced in the same office and also had treated Mr. McBee, notably assessing Mr. McBee for "shoulder pain" in office visit notes dated April 26, 1999. Inasmuch as the younger Dr. Coleman continued with Mr. McBee's treatment and testified in this matter, we will refer to him throughout this opinion as "Dr. Coleman" for ease of reference.

testified that in 2004, he experienced more pain in his shoulders at work than at home, he further testified that he did not attribute his shoulder pain to any specific duties for CSX until he became a foreman flagman for the second time. Mr. McBee initially testified that he had begun working as a foreman flagman for the second time in June or July 2007, but upon production of records he had kept for CSX as a foreman flagman, he stipulated that he actually began working in this position in January 2007. Mr. McBee stated that his shoulders began to hurt in a different, more severe way than they ever had before in 2008 as he was driving flag posts into the ground by hand, a task he had been performing since January 2007.

According to Mr. McBee, his responsibilities as a foreman flagman included beginning each day by verifying track orders to clear sections of railroad track for repair and then placing track flags on each side of the track as a warning to oncoming train crews. The flags were bolted onto seven-foot-high posts made of angle-iron ("Angle-Iron Flags"). The Angle-Iron Flags, which had to be removed each evening, were driven into the ballast[2] or ground along the railroad track to ensure their stability. Mr. McBee stated that during a typical day as a foreman flagman, his physical labor was limited to placing eight Angle-Iron Flags in the morning and removing them in the evening, with the remainder of his work day devoted to monitoring radio communications. During this time period, Mr. McBee was based in Bridgeport, Alabama, and was providing protection on the railroad tracks for a contractor's employees who were tearing down an old bridge. Mr. McBee stated that he was the only railroad worker present on the jobsite.

When questioned regarding what differences he perceived in his duties between the first time he became a foreman flagman in 1991 and the second time in 2007, Mr. McBee stated that CSX previously had provided him with a sledgehammer to drive in the Angle-Iron Flags. He explained that following an incident in 2003 during which an employee had been injured, it was his understanding that the CSX division engineer had prohibited foremen flagmen from using sledgehammers to erect the Angle-Iron Flags in order to prevent injuries caused by metal breaking off the posts when the flag posts were struck by a sledgehammer. Mr. McBee maintained that he began to experience severe pain in both shoulders after a few months of driving the Angle-Iron Flags into the ground by hand.

Dr. Coleman's medical records and deposition testimony indicated that following Mr. McBee's 2004 and 2005 office visits in which he complained of shoulder pain, he next sought treatment for shoulder pain on February 19, 2007, approximately one month

---

[2] "'[T]rack ballast is the stone or other material placed underneath and around railroad tracks to provide the structural support, drainage, and erosion protection necessary for safe rail travel.'" *Ward v. Ill. Cent. R.R. Co.*, No. W2012-01839-COA-R3-CV, 2013 WL 3128974, at *8 n.3 (Tenn. Ct. App. June 20, 2013) (quoting *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 428 (6th Cir. 2009)).

after he had begun working as a foreman flagman again. Dr. Coleman again diagnosed Mr. McBee with arthritis in his shoulders, with the pain more severe in the left shoulder. Dr. Coleman further diagnosed "tendonitis or a bursitis" of the shoulders. Although Dr. Coleman testified that at this point, Mr. McBee's injuries caused the doctor to consider whether Mr. McBee might have a rotator cuff tear, Dr. Coleman did not think the cuff was torn and did not inform Mr. McBee of the possibility. In June 2008 and again in November 2008, Mr. McBee returned to Dr. Coleman, seeking treatment for severe bilateral shoulder pain. Dr. Coleman continued treating Mr. McBee with anti-inflammatory drugs, including Mobic and a Medrol Dosepak. Mr. McBee returned to Dr. Coleman in February 2009 with especially severe pain in his left shoulder, at which time Dr. Coleman recorded in his notes in part: "[Mr. McBee's] shoulder is getting worse. He now has frozen shoulder with difficulty using the left arm much at all. . . . He cannot really rotate internal or external." On February 18, 2009, Dr. Coleman referred Mr. McBee to an orthopedic surgeon, Dr. John Greco.

Testimony and medical records demonstrated that throughout the years, Dr. Coleman had treated Mr. McBee for various other medical conditions, including hypertension, diabetes, gout, and sleep apnea. In his referral letter to Dr. Greco, Dr. Coleman explained that he had been unable to obtain a magnetic resonance imaging scan ("MRI") on Mr. McBee's left shoulder because Mr. McBee "was too broad for the machine" at two local medical facilities. Mr. McBee testified at the time of his July 2011 deposition that he was five feet, six or seven inches tall and weighed approximately 340 pounds. Mr. McBee acknowledged that he had weighed over 300 pounds since leaving his work for the railroad in 2009. Dr. Coleman testified that he had advised Mr. McBee to lose weight for several years but that Mr. McBee so far had not been successful in the attempt.

Dr. Greco initially saw Mr. McBee on February 23, 2009, and scheduled Mr. McBee's left shoulder surgery on March 30, 2009. In the corresponding operative summary, Dr. Greco indicated a preoperative diagnosis of "[l]eft shoulder impingement with acromioclavicular joint disease and partial versus full thickness rotator cuff tear." The postoperative diagnosis was "[l]eft shoulder impingement with acromioclavicular joint disease and large rotator cuff tear with moderate retraction. Also, posterosuperior labral tear." Dr. Greco subsequently performed surgery to repair Mr. McBee's right rotator cuff on August 7, 2009. Dr. Greco testified by deposition that Mr. McBee's left shoulder did not heal after the first surgery and required another operation. Dr. Greco further testified that although Mr. McBee's right shoulder did heal after the first surgery, Mr. McBee continued to experience pain in that shoulder and required another procedure to clean out scar tissue.

On June 21, 2010, Mr. McBee filed the instant action, alleging in pertinent part:

During [Mr. McBee's] employment by [CSX] as a trackman, machine operator, track foreman, tamping gang foreman and foreman-flagman under the direct control of [CSX's] agents, servants, and employees[,] [Mr. McBee] was negligently exposed to repeated physical trauma caused by repetitive activities. [Mr. McBee] was unaware of any latent condition until a time within three (3) years before the filing of this lawsuit and as a result of this exposure [Mr. McBee] has been diagnosed with torn rotator cuffs in both shoulders.

CSX filed an answer on July 26, 2010, denying all substantive allegations and any liability for Mr. McBee's injuries. CSX asserted affirmative defenses, including as relevant to this appeal, that Mr. McBee's claim was time-barred by the statute of limitations provided in 45 U.S.C. § 56. CSX concomitantly filed a counterclaim, requesting that in the event of a judgment awarded to Mr. McBee, CSX receive a set-off or credit for, *inter alia*, any medical benefits, disability annuities, insurance benefits, or Railroad Retirement Board contributions previously paid on Mr. McBee's behalf by CSX.

On February 15, 2012, CSX filed a motion for summary judgment based on the applicable three-year statute of limitations. Predicated on Mr. McBee's acknowledged degenerative joint disease in his shoulders since 1999, CSX argued that his claims accrued prior to June 21, 2007, more than three years before the claim's filing on June 21, 2010. To this motion, CSX attached Mr. McBee's deposition testimony and medical records detailing Mr. McBee's office visits to Dr. Coleman. Mr. McBee filed a response, attaching medical records demonstrating Dr. Greco's treatment of Mr. McBee and referral communication between Dr. Coleman and Dr. Greco. Following a hearing, the trial court denied CSX's motion on April 20, 2012, but stated that it would reconsider if presented with "sufficient proof to establish that the degenerative joint disease is somehow related to the rotator cuff tear." The trial court entered a scheduling order on November 4, 2013, scheduling a deadline for all discovery to close in January 2014 and a trial date of March 3, 2014.

On January 24, 2014, CSX filed a renewed motion for summary judgment based on the statute of limitations, attaching, *inter alia*, excerpts of deposition testimonies proffered respectively by Dr. Greco and two independent medical experts initially secured by Mr. McBee: Dr. Ernest L. Howard, II, and Dr. Apurva Rashmikant Dalal. CSX concomitantly filed two additional motions for summary judgment based on, respectively, an alleged lack of expert testimony regarding medical causation and an alleged inability to prove liability through expert testimony.

5

In support of its motion for summary judgment regarding liability, CSX submitted an affidavit executed by Brian T. Weaver, P.E., an expert in biomechanics and engineering, who opined in an attached report that Mr. McBee's working conditions were "reasonably safe" and that CSX would not have had prior knowledge that Mr. McBee's job functions would cause his injuries. CSX also attached to its motion excerpts of Dr. Howard's and Dr. Dalal's respective deposition testimonies, although CSX concomitantly filed a motion to exclude expert causation testimony offered by Dr. Howard and Dr. Dalal, as well as a subsequent motion to exclude causation testimony offered by Dr. Coleman. Mr. McBee filed a response to CSX's motion for summary judgment as to liability, attaching Mr. McBee's deposition testimony and referencing the deposition testimonies of Dr. Coleman and Dr. Howard. In addition, the record contains deposition testimonies proffered respectively by a medical expert secured by CSX, Dr. Owen B. Tabor; Mr. McBee's CSX supervisor, Roadmaster Glen Ernest Church, Jr.; three CSX employees who had worked as foremen flagmen and had at times been Mr. McBee's coworkers; Mr. McBee's daughter, Lisa Taylor, who is also an occupational therapist; and Mr. McBee's wife, Brenda McBee. Mr. McBee did not present a "liability expert" to refute Mr. Weaver's testimony.

Following a hearing conducted on March 4, 2014, the trial court denied the motions for summary judgment based on the statute of limitations and alleged lack of proof of medical causation.[3] The court took under advisement the remaining motion for summary judgment. On June 3, 2015, the court entered an "Order Granting Defendant's Motion for Summary Judgment Based on Inability of Plaintiff to Prove Liability through Expert Testimony."[4] The court found that without expert technical testimony regarding CSX's purported liability, Mr. McBee had failed to demonstrate "a genuine issue for trial" that could establish CSX's negligence. Mr. McBee timely appealed.

---

[3] CSX has not appealed the denial of its motion for summary judgment concerning medical causation.

[4] Although not raised as an issue on appeal, we note that the fifteen-month period between the hearing and order in this matter exceeded the time limit placed by our Supreme Court on how long a motion may be under advisement. Tennessee Supreme Court Rule 11, § III(c) provides in pertinent part:

> No case may be held under advisement in excess of sixty days and no motion, or other decision of the trial judge that delays the date of trial or final disposition in the trial court, shall be held under advisement for more than thirty days, absent the most compelling of reasons.

(Citing Tenn. Code Ann. § 20-9-506.)

## II. Issues Presented

Mr. McBee presents one issue on appeal, which we have restated as follows:

1. Whether the trial court erred by granting summary judgment in favor of CSX upon the court's finding that without presentation of expert witness testimony regarding CSX's alleged breach of duty and foreseeability of harm, Mr. McBee had failed to raise a genuine issue of material fact supporting his negligence claim under FELA.

CSX presents an additional issue, which we have similarly restated as follows:

2. Whether the trial court erred by denying CSX's motion for summary judgment on the alternative ground that Mr. McBee's claim is time barred by the statute of limitations provided in 45 U.S.C. § 56.

## III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but

7

must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S.Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65 (emphasis in original). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

At the time the trial court entered its order in the instant action, our Supreme Court had not yet issued its opinion in *Rye*, 477 S.W.3d 235. The trial court therefore applied the summary judgment standard previously set forth in *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008) (directing a trial court to grant summary judgment only if the moving party could either (1) affirmatively negate an essential element of the nonmoving party's claim or (2) show that the nonmoving party could not prove an essential element of the claim at trial). In *Rye*, our Supreme Court overruled *Hannan* to "return to a summary judgment standard consistent with Rule 56 of the Federal Rules of Civil Procedure." *Rye*, 477 S.W.3d at 238. The *Rye* Court expressly noted that its holding should be applied retrospectively. *Id.* at 263 n.9 ("In civil cases, judicial decisions overruling prior cases generally *are applied retrospectively.*") (emphasis in original). Thus, although the trial court's application of the *Hannan* standard was appropriate at the time of the trial court's entry of summary judgment, we must apply the *Rye* standard in reviewing the trial court's ruling on appeal. As our Supreme Court explained:

Our overruling of *Hannan* means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye*, 477 S.W.3d at 264 (emphasis in original).

### IV. Lack of Expert Witness Testimony to Establish Liability

Mr. McBee contends that the trial court erred by finding that he was required to present expert testimony in support of his allegations that (1) CSX should have reasonably foreseen that placing the flag posts by hand would cause his injuries and (2) CSX breached its duty of care owed to him as an employee. Mr. McBee also contends that the court erred by declining to make a finding as to whether the evidence he presented, despite not constituting expert testimony regarding liability, did establish a genuine issue of material fact in support of CSX's alleged liability for his injuries. Mr. McBee asserts that the trial court erroneously created a new rule regarding expert witnesses as to causation in FELA claims. CSX, however, argues that rather than creating a new rule, the trial court properly found that expert testimony as to causation would be required in this case because the questions of railroad procedure and placement of flag posts with specific equipment raise technical issues that are beyond the common knowledge of typical jurors. CSX conceded during the hearing on this motion and concedes on appeal that an expert witness is not required to establish liability for every FELA claim. Upon our careful review of the record and applicable authorities, we determine that the trial court properly considered the specific facts of this case rather than attempting to enforce a blanket requirement of expert testimony regarding liability. However, we further determine that even lacking expert testimony on the issue, Mr. McBee presented evidence that created a material factual dispute as to whether CSX caused or contributed to Mr. McBee's bilateral torn rotator cuff injuries by failing to provide him with a safe procedure and equipment for driving flag posts into the ballast or ground.

Section 51 of FELA provides in relevant part:

Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the

9

States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. Although the Tennessee Workers' Compensation Law is the exclusive remedy for employees who are subject to it, *see* Tenn. Code Ann. § 50-6-108 (2014), "[t]he statute, however, does not apply to '[a]ny common carrier doing an interstate business while engaged in interstate commerce, which common carrier and the interstate business are already regulated as to employer's liability . . . by act of Congress.'" *Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 630 n.2 (Tenn. 2009) (quoting Tenn. Code Ann. § 50-6-106(1)(A)). The *Mills* Court, describing the same defendant railroad as the one in the instant action, noted that "CSX is a railroad company engaged in interstate commerce, and its liability for employee injuries is . . . determined by applying the FELA." *Mills*, 300 S.W.3d at 630 n.2. "A plaintiff may bring an FELA action in either federal or state court." *Id.* at 631 (citing 45 U.S.C. § 56). "'As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal.'" *Mills*, 300 S.W.3d at 631 (quoting *St. Louis Sw. Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985)).

Mr. McBee asserts at the outset that "[t]here is a strong presumption against summary judgment under [FELA.]" In support of this assertion, he relies on several federal intermediate appellate court decisions and one United States Supreme Court decision, *Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359 (1952).[5] However, *Dice* involved a jury trial and the state trial court's judgment notwithstanding the jury's verdict, in which the trial court vacated the jury's finding that the plaintiff employee had proven fraud on the part of the defendant railroad. *See Dice*, 342 U.S. at 363 (holding that substantive federal rather than state law controls in FELA actions and concluding that "[t]he trial judge and the Ohio Supreme Court erred in holding that petitioner's rights were to be determined by Ohio law and in taking away petitioner's verdict when the issues of fraud had been submitted to the jury on conflicting evidence and determined in petitioner's favor."). The *Dice* decision contains no specific mention of a presumption against summary judgment, although the High Court emphasized that the right to a jury trial is essential under FELA. *See id.* at 363 ("We have previously held that 'The right to trial by jury is "a basic and fundamental feature of our system of federal

---

[5] We note that in general, federal intermediate appellate decisions represent persuasive rather than controlling authority for this Court. *See Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 785 n.3 (Tenn. Ct. App. 2010).

jurisprudence"' and that it is 'part and parcel of the remedy afforded railroad workers under the Employers' Liability Act.'") (quoting *Bailey v. Cent. Vt. Ry., Inc.*, 319 U.S. 350, 354 (Tenn. 1943)). CSX maintains that upon a properly filed motion for summary judgment, a FELA claim is subject to the "ordinary rules" of summary judgment. We agree with CSX on this point and review the trial court's grant of summary judgment as we would any other summary judgment granted pursuant to Tennessee Rule of Civil Procedure 56. We note that the trial court's application of Rule 56 is a procedural matter, governed by state procedural rules. *See Mills*, 300 S.W.3d at 631 (applying the standard of review then in effect for summary judgment in Tennessee, pursuant to *Hannan*, 270 S.W.3d at 8-9); s*ee, e.g., Ward v. Ill. Cent. R. Co.*, No. W2012-01839-COA-R3-CV, 2013 WL 3128974, at \*13 (Tenn. Ct. App. June 20, 2013), *perm. app. denied* (Tenn. June 20, 2013) (applying Tenn. R. Civ. P. 56 and state case precedent as the standard of review for summary judgment).

This Court previously has explained that pursuant to federal substantive law, a successful FELA claimant must be able to establish that:

> (1) the employee was injured in the scope of employment; (2) the employee's employment was in furtherance of the railroad's interstate transportation business; (3) the railroad was negligent; and (4) the railroad's negligence "played some part in causing the injury for which [the employee] seeks compensation under FELA."

*Mills*, 300 S.W.3d at 631 (quoting *Van Gorder v. Grand Trunk W. R.R.,* 509 F.3d 265, 269 (6th Cir. 2007)).

In this case, it is undisputed that Mr. McBee suffered bilateral torn rotator cuff injuries to his shoulders. Although CSX disputes whether Mr. McBee's shoulder injuries are attributable to his work as a foreman flagman, CSX does not dispute that Mr. McBee's actions in erecting Angle-Iron Flags were performed within the scope of his employment and in furtherance of CSX's interstate transportation business. Our analysis of this issue is therefore narrowed to whether without expert witness testimony regarding CSX's liability, Mr. McBee has demonstrated the existence of specific facts that could lead a rational trier of fact to find that (1) CSX was negligent in the procedure or equipment it provided for erecting the flags and (2) such negligence played some part in causing Mr. McBee's torn rotator cuff injuries. *See id.*; *see also Rye*, 477 S.W.3d at 265 ("The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.").

Regarding the establishment of negligence under FELA, our Supreme Court has explained in pertinent part:

11

As to the third and fourth elements of a FELA claim, a railroad may be found liable under a theory of either "ordinary negligence" or "negligence per se."  A claim of "ordinary negligence" requires the plaintiff to establish the common law elements of negligence:  duty, breach, foreseeability, and causation. *Adams v. CSX Transp., Inc.,* 899 F.2d 536, 539 (6th Cir. 1990) (quoting *Robert v. Consol. Rail Corp.,* 832 F.2d 3, 6 (1st Cir.1987)).[FN]  As an alternative to proving the elements of duty, breach, and foreseeability, a plaintiff may rely upon a theory of "negligence per se" if the railroad has failed to comply with a statutory or regulatory standard.

[FN] This Court has described the elements of negligence as "'(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.'" *Parker v. Holiday Hospitality Franchising, Inc.,* 446 S.W.3d 341, 350 n.7 (Tenn. 2014) (quoting *Satterfield v. Breeding Insulation Co.,* 266 S.W.3d 347, 355 (Tenn. 2008)).

*Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 435 n.17 (Tenn. 2015) (additional internal citations omitted).

Although Mr. McBee alleged in his complaint, *inter alia*, that CSX had violated the "General Duty" clause of the Occupational Safety and Health Act of 1970, *see* 29 U.S.C.A. § 654(a)(1) (West 2008), in pursuing this appeal, he has not argued that CSX failed to comply with a specific statutory or regulatory standard and has therefore not asserted a claim under a theory of negligence *per se*.  He has instead asserted a claim for ordinary negligence and must establish the common law elements of duty, breach, foreseeability, and causation in order to succeed at trial.  *Cf. Payne*, 467 S.W.3d at 435-36 ("'Under a negligence per se theory, if a plaintiff proves that a statutory violation has occurred[,] he need not prove the traditional negligence elements of foreseeability, duty[,] and breach, but he is still required to prove causation.'") (quoting *Capriotti v. Consol. Rail Corp.*, 878 F. Supp. 429, 434 (N.D.N.Y. 1995) (alterations in *Payne*).  We note also that by the time of the hearing on the summary judgment motions, Mr. McBee had confined his claim to CSX's alleged negligence from January 2007 through March 2009, when Mr. McBee had worked as a foreman flagman for the second time, and the injury of bilateral rotator cuff tears.

The standard of causation under FELA has been described as "relaxed" in comparison to tort litigation at common law.  *See, e.g., Szekeres v. CSX Transp., Inc.*, 731

F.3d 592, 597-98 (6th Cir. 2013). Regarding the standard for proving causation under FELA, our Supreme Court has explained:

> The standard for causation under FELA leans favorably to the injured employee, requiring juries to be instructed that "a defendant railroad 'caused or contributed to' a railroad worker's injury 'if [the railroad's] negligence played a part—no matter how small—in bringing about the injury.'" *[CSX Transp., Inc. v.] McBride,* 131 S.Ct. [2630,] 2644 [(2011)] (alteration in original); *see also Urie v. Thompson,* 337 U.S. 163, 181, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (recognizing that FELA's language on causation "is as broad as could be framed"). Thus, in order to prove the element of causation, a FELA plaintiff need only show that the railroad's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Moreover, as the U.S. Supreme Court has explained, "[i]t does not matter that . . . the jury may also . . . attribute the [injury] to other causes, including the employee's contributory negligence. . . . [FELA] expressly imposes liability upon the [railroad] to pay damages for injury or death due 'in whole or *in part*' to its negligence." *Id.* at 506-07, 77 S.Ct. 443; *see also McBride,* 131 S.Ct. at 2638.

*Payne*, 467 S.W.3d at 436. *See Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001) ("Congress intended FELA to be a departure from common law principles of liability as a 'response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety.'") (quoting *Aparicio v. Norfolk & W. Ry. Co.,* 84 F.3d 803, 807 (6th Cir.1996)) (in turn quoting *Sinkler v. Mo. Pac. R.R. Co.,* 356 U.S. 326 (1958)).

CSX acknowledges that it owed a duty to Mr. McBee while he was an employee to provide a safe working environment. *See Payne*, 467 S.W.3d at 435 ("Under FELA, a railroad has a non-delegable duty to provide its employees with a reasonably safe place in which to work . . . ."). In its order granting summary judgment in favor of CSX, the trial court made the following specific findings in relevant part:

> Upon consideration of the submissions of the parties, the authorities relied upon, and the entire record in this cause, the Court finds that the elements of breach of duty and foreseeability of harm, which are essential to [Mr. McBee's] FELA claims, must be proven by expert testimony in this case through a witness with specialized knowledge, education, training, and/or experience outside that of a layperson.

13

[Mr. McBee] provided no evidence in the form of required expert testimony to support his claims that [CSX] breached its duty to [Mr. McBee] or that injury was reasonably foreseeable to [CSX], and he cannot do so at trial.

Furthermore, [Mr. McBee] offered no rebuttal in the form of expert testimony to the expert opinions of [CSX's] liability expert, Brian T. Weaver, to create an issue for trial regarding breach of duty or reasonable foreseeability of harm, elements which were affirmatively negated by [CSX].

The only expert testimony cited by [Mr. McBee] in response to [CSX's] motion is the medical testimony of Dr. Hardin Coleman and Dr. Ernest Howard. However, neither Dr. Coleman nor Dr. Howard, nor any other expert disclosed by [Mr. McBee], can or will testify at trial that [CSX] breached its duty to provide a reasonably safe workplace or that injury was reasonably foreseeable to [CSX].

The Court finds that [CSX's] motion for summary judgment, including the supporting statement of material, undisputed facts, the memorandum of law, the accompanying exhibits, and the affidavit of Brian T. Weaver with exhibits, complied with Rule 56 of the Tennessee Rules of Civil Procedure. The Court further finds that the applicable procedures set forth in *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 5 (Tenn. 2008) and its progeny were satisfied by [CSX], and the burden of production shifted to [Mr. McBee] to show that there was a genuine issue for trial.

Viewing the evidence in a light most favorable to the nonmoving party, [Mr. McBee] did not satisfy this burden. Accordingly, [CSX] is entitled to judgment as a matter of law.

(Paragraph numbering omitted.)

The trial court thus found that in the instant action, expert testimony would be "required" at trial in order to counter CSX's presentation of Mr. Weaver's expert opinion as it related to foreseeability and causation. Although the trial court employed the term, "required," we do not find that the court made such a sweeping statement as to erroneously imply that all FELA claims must be supported by expert witness testimony regarding causation. *See, e.g., Hardyman*, 243 F.3d at 269 (holding that the expert medical testimony regarding the plaintiff's carpal tunnel syndrome, "even without expert

14

causation testimony, certainly would be adequate to provide a jury with the 'special expertise . . . necessary to draw a causal inference'") (quoting *Claar v. Burlington N. R.R.,* 29 F.3d 499, 504 (9th Cir. 1994)). The trial court did find, however, that without expert causation testimony in this case, Mr. McBee would not be able to establish that CSX could reasonably have foreseen that repetitively driving Angle-Iron Flags into the ground by hand could cause or contribute to the development of his rotator cuff tears or that by requiring or allowing him to continue erecting Angle-Iron Flags by hand, CSX breached its duty to provide Mr. McBee with a safe working environment.

"Courts have repeatedly held . . . that in FELA cases the element of causation may be established through circumstantial evidence or common knowledge, and that direct or expert testimony is not required." *Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 916 (7th Cir. 2012) (internal citations omitted). As the Sixth Circuit has explained in the context of a FELA action:

> [A]s this court has recognized, expert testimony is not necessary to support allegations of negligence. *See, e.g., Richards* [*v. Consol. Rail Corp.*]*,* 330 F.3d [428,] 433 [(6th Cir. 2003)] (plaintiff's testimony alone was sufficient to show that an appliance failed to function properly). *See also Ulfik v. Metro-North Commuter R.R.,* 77 F.3d 54, 59 (2d Cir. 1996) (it was within the common knowledge of the jury to determine whether there was a link between exposure to paint fumes and claimed headaches); *Lynch v. METRA,* 700 F.3d 906, 915 (7th Cir. 2012) (no expert testimony needed on "easily understood" concept of improper installation of equipment). For the reasons discussed above, including the testimony of Whittenberger [a railroad supervisor] that mud is a recognized hazard in the railroad industry, this court finds that, even without the testimony of Arton [an expert witness whose testimony was excluded by the district court], there was sufficient evidence upon which a reasonable trier of fact could conclude that the muddy conditions and/or lack of ballast in the area behind the Valley City switch was a cause of Plaintiff's injury under FELA and LIA [Locomotive Inspection Act].

*Szekeres*, 731 F.3d at 603.

Although not an example of substantive federal law under FELA, CSX notes our Supreme Court's holding in *Lawrence Cnty. Bank v. Riddle*, 621 S.W.2d 735, 737 (Tenn. 1981), that expert testimony was not required to prove liability in a situation involving a collapsed wall at a construction site because the issue at hand was comprehensible to jurors through their own lay knowledge. The Court explained:

15

In Casone v. State, 193 Tenn. 303, 246 S.W.2d 22, 26 (1952), Justice Burnett taught us when expert testimony is necessary. The subject under examination must be one that requires that the court and jury have the aid of knowledge or experience such as men not specially skilled do not have, and such therefore as cannot be obtained from ordinary witnesses.

As the learned text writer points out, "the subject of expertise must be one that would not be comprehensible to jurors without the aid of an expert witness." Paine, Tennessee Law of Evidence, s 174. We do not perceive this to be such a case. The digging of ditches and the laying of cables are matters within the ken of ordinary laymen. The vagaries of the weather are matters of great concern and a topic of daily conversation among people generally, regardless of their background, profession, or station in life.

Therefore, we hold that in this case it was not necessary to present expert testimony concerning good practices in the construction and public utilities fields.

*Lawrence Cnty. Bank*, 621 S.W.2d at 737. CSX distinguishes the factual situation in *Lawrence Cnty.* from the instant action by asserting that unlike the methods of digging ditches and laying cables, "determining the risk factors associated with repetitive stress and when those risks become unreasonable . . . requires knowledge of physiology, biomechanics, and ergonomics" that the average juror would not possess without assistance from an expert. Given the specific factual circumstances of this case, we disagree.

In a recent case involving a FELA claim of negligence *per se*, this Court reversed the trial court's grant of summary judgment to the defendant railroad upon finding that the lower court had erroneously required the plaintiff employee to present expert testimony on the issue of whether the railroad had violated a Federal Railroad Safety Act regulation regarding the composition of ballast. *See Ward*, 2013 WL 3128974, at *13. The employee alleged that his ankle injury was due to the railroad's requiring him to walk for years on hard, uneven surfaces. *Id.* at *2. This Court explained:

[T]he question, at this stage in the litigation, is simply whether a dispute exists regarding whether ICRR complied with the mandates of 49 C.F.R. § 213.103. ICRR has cited no law in which the question of whether a railroad has complied with 49 C.F.R. § 213.103 must be established by expert proof. From our review of the federal ballast regulation, the regulation concerns not the composition or installation of the ballast but

16

whether the ballast is adequately serving its purpose, i.e., whether the ballast is allowing proper drainage. *See* 49 C.F.R. § 213.103. To undermine Mr. Chapman's opinion that the ballast properly complied with 49 C.F.R. § 213.103, Mr. Ward offered the testimony of Mr. Bolden, who testified based on his observations of the railroad yard that the ballast allowed water to stand in the yard. Mr. Bolden's testimony that there was standing water on the yard, based on his own personal knowledge, was, thus, sufficient to controvert Mr. Chapman's affidavit that the ballast was providing proper drainage for the yard in compliance with 49 C.F.R. § 213.103. Indeed, in a similar case involving preclusion of a widow's FELA claim based on improper ballast and vegetation, this Court considered probative testimony from similarly situated employees of the defendant railroad that vegetation was overgrown and could cause problems for employees. *See Melton* [*v. BNSF Ry. Co.*]*,* 322 S.W.3d [174,] 189-90 [(Tenn. Ct. App. 2010)] (considering the testimony of a railroad carm[a]n [as] to what he observed in the railway yard). Based on this testimony, the *Melton* Court concluded that material issues of fact existed that prevented summary judgment. *Id.* Likewise in this case, Mr. Bolden's testimony is competent to undermine Mr. Chapman's affidavit that ICRR was fully compliant with 49 C.F.R. § 213.103 and create a material factual dispute on this issue.

*Id.* at *13. The *Ward* Court thus determined that evidence consisting of observations made by the employee's coworker was sufficient to create a genuine issue of material fact regarding the railroad's procedure and compliance with the regulation in question. *See id.*

Although Mr. McBee does not seek to establish that CSX violated a specific regulation, he does seek to demonstrate that CSX supervisors knew or should have known that driving seven-foot tall Angle-Iron Flags into the ballast or ground by hand eight times a day for months on end would foreseeably cause shoulder injuries, particularly rotator cuff injuries. As the trial court noted, CSX presented with its motion for summary judgment an expert report authored by Mr. Weaver, a biomechanics and engineering expert. In reaching his opinions, Mr. Weaver reviewed, *inter alia*, pleadings filed in this action; deposition transcripts and exhibits; CSX rules, safety manuals, and job descriptions; Mr. McBee's personnel file and medical records; and the actual tools involved in performing the work of a foreman flagman. Mr. Weaver rendered the following opinions "to a reasonable degree of engineering and biomechanical certainty":

17

1. There is no biomechanical or scientific basis to conclude that Mr. McBee's job duties as a Foreman Flagman caused or contributed to his diagnosed bilateral shoulder pathologies.

2. The available scientific evidence indicates that age and body mass index (BMI) are known risk factors for the development of Mr. McBee's diagnosed bilateral shoulder pathologies. Consequently, Mr. McBee's personal factors, such as his age and BMI explain the development of his diagnosed shoulder pathologies.

3. From a biomechanics perspective, Mr. McBee's job tasks as a Foreman Flagman were reasonably safe.

4. [CSX] implemented and had all the fundamental elements associated with an Injury Control Program.

The trial court found that in response to CSX's motion for summary judgment based on liability, Mr. McBee had cited only expert testimony proffered by Dr. Coleman and Dr. Howard, both of whom testified that they believed Mr. McBee's rotator cuff tears to be primarily the result of repetitive movement. Although Dr. Coleman and Dr. Howard each respectively testified that as Mr. McBee had described the task of driving in flag posts to them, they believed the repetitive action of doing so could have contributed to Mr. McBee's rotator cuff tears, neither doctor attempted to offer expert testimony concerning CSX's alleged negligence. However, in focusing solely on expert testimony, the trial court's summary of Mr. McBee's evidence presented on this issue fails to take into account the deposition testimonies of Mr. McBee's supervisor during the relevant time period and three CSX employees who had worked as foremen flagmen, as well as Mr. McBee's own deposition testimony regarding how he came to believe that CSX was requiring him to use the Angle-Iron Flags and to drive them into the ballast or ground by hand.

Mr. McBee testified that as of 2003, a division engineer had stopped employees from striking Angle-Iron Flags with a sledgehammer because of an incident when an employee had been injured by a piece of flying metal. Mr. McBee acknowledged that while he was working as a foreman flagman from January 2007 to March 2009, he never filed a written complaint with CSX regarding the procedure for erecting the Angle-Iron Flags. He testified that at some point in 2007 or 2008, he did complain via telephone to his supervisor at the time, Mr. Church. He also testified that he explained the difficulty he was having with the Angle-Iron Flags to a safety committee member who visited his jobsite, but he stated that he did not receive a response and could not remember the committee member's name. Mr. McBee further testified that he spoke to W.O. Price, a

roadmaster who was substituting for Mr. Church for approximately two weeks in 2008, about a new type of flag post that CSX had begun to utilize. The new type of flag post consisted of a single bar with a crook in it ("Single-Bar Flag"). The Single-Bar Flags also had two prongs on the bottom and were purportedly easier to drive into the ballast or ground by hand. According to Mr. McBee, he requested the Single-Bar Flags from Mr. Price, but Mr. Price told him that the Single-Bar Flags were unavailable.

Mr. Church testified by deposition that he had worked "around" or "with" Mr. McBee from 1979 through March 2009. Serving in the position of roadmaster, Mr. Church had been Mr. McBee's supervisor from January 2007 through March 2009. Mr. Church stated that Mr. McBee had been a good, dependable employee. He denied, however, that Mr. McBee had ever complained to him about the type of flag posts used or the procedure for erecting them. He maintained that although he knew that Mr. McBee had taken medical leave in March 2009 in order to undergo shoulder surgery, he did not know prior to testifying in this action that Mr. McBee claimed to have been injured on the job.

Mr. Church testified that in 2005, CSX had begun to replace the Angle-Iron Flags with Single-Bar Flags but had not removed the Angle-Iron Flags from use. He opined that CSX introduced the Single-Bar Flags in an effort to "find something that [employees] didn't have to strike." He stated, however, that he knew of no prohibition issued by CSX against the use of sledgehammers to drive the Angle-Iron Flags into the ballast or ground. Mr. Church explained that although certain tools he had used in his work posed a risk of metal pieces breaking off when they were hit with a sledgehammer, those tools, namely a spike lifter and anchor lifter, were made of "hard metal" in contrast to the Angle-Iron Flags, which he stated were made of "soft metal." He further explained that since CSX had begun using spike lifters in the mid-1990s, each spike lifter had a rubber, donut-shaped grommet on the top as a "chip protector" to guard against metal chips breaking off when the spike lifter was struck with a sledgehammer. He stated that the anchor lifter also had a chip protector, which was a piece of reinforced plastic hose with a clamp to secure it. In contrast to the spike lifters and ankle lifters, Mr. Church explained that the Angle-Iron Flags would sometimes "mash and mushroom" when hit with a sledgehammer but that they did not chip or break off at the top. He stated that he knew of one employee who had suffered a laceration when placing a "mushroomed" Angle-Iron Flag into a truck. According to Mr. Church, the Single-Bar Flags were meant to prevent the mushrooming effect because they could be driven into the ballast or ground by hand.

However, Mr. Church further testified that he had found the Single-Bar Flags to be unwieldy and dangerous due to their increased sharpness, weight, and length, which caused the sharp bottom ends to protrude from the back of a truck when loaded for

transport. According to Mr. Church, when CSX introduced the Single-Bar Flags in 2005, an "engineer of track" explained to the employees the procedure for their use. Mr. Church maintained that after he had used the Single-Bar Flags, he told the assistant division engineer at the time, Jimmy Parott, that he did not like using the Single-Bar Flags and did not think they were effective. Mr. Church stated that he had relayed his opinion to Mr. Parott during a weekly Monday morning call during which safety concerns could be reviewed. Mr. Church maintained that when Mr. Parott told CSX authorities that some workers were dissatisfied with the Single-Bar Flags, the authorities directed that the workers could retain the option of using the Angle-Iron Flags. Mr. Church denied any knowledge of Mr. McBee's having requested the Single-Bar Flags. Mr. Church stated that when he sometimes had to erect temporary flags in his role as roadmaster, he used the Angle-Iron Flags, driving them in with a sledgehammer when the ballast or ground was hard or by hand when the surface was softer. When questioned regarding whether Mr. McBee was allowed to use a sledgehammer or was supposed to use only his hands to drive the Angle-Iron Flags into the ground, Mr. Church responded: "Use the sledgehammer." He acknowledged that Mr. McBee was under his supervision while working as a foreman flagman from 2007 to 2009.

During his deposition testimony, Mr. Church was also questioned regarding the potential use of a two-handled post driver to drive Angle-Iron Flags into the ballast or ground. He testified that he had never used a post driver to erect temporary signs such as Angle-Iron Flags. He stated that he had used a post driver to erect permanent signs and that once he became a roadmaster, he carried a post driver in his truck. He explained that although some other roadmasters carried post drivers, it was usually track inspectors who had them because track inspectors were required to erect permanent speed restriction signs, which resembled highway signs. Mr. Church stated that a two-handled post driver could not be used to erect an Angle-Iron Flag because a sign would already be mounted on the angle iron, meaning that the post driver would not fit over the top of the sign. In response to a query from Mr. McBee's counsel, Mr. Church acknowledged that it would be possible to unbolt the sign, use a post driver to drive the post into the ballast or ground, and then bolt the sign on again.

Three other CSX employees who had worked as foremen flagmen testified by deposition: Jeffrey R. Joines, James Lackey, and William B. Land. Mr. Joines testified that he began working for CSX in 2000 as a "track man" and currently worked for CSX as a machine operator. He stated that he was also the president of his local lodge of the Brotherhood of the Maintenance of Way Union ("Maintenance of Way Union") and performed some legislative lobbying for railroad workers. Mr. Joines explained that he had worked as a flagman on occasion but had not done so since 2005.[6] Mr. Joines stated

---

[6] Prior to the March 2014 hearing on CSX's motions for summary judgment, CSX filed a motion to exclude Mr. Joines's testimony on the basis that he had not worked as a foreman flagman during the same

that he had worked with Mr. McBee in the past, and he opined that Mr. McBee interacted well with coworkers, followed supervisors' instructions and orders, knew his job, and was dependable. To his knowledge, Mr. McBee was a member of the Maintenance of Way Union but was not a member of Mr. Joines's lodge.

Mr. Joines testified that since 2005, he had assisted others occasionally to erect Single-Bar Flags but that he had used Angle-Iron Flags when he worked as a foreman flagman prior to 2005. According to Mr. Joines, he would drive the Angle-Iron Flags into the ballast or ground by hand, and it would take a "minimum of six or seven times" to drive the flags in solidly enough to remain standing when a train traveled by, sometimes at sixty miles per hour. Mr. Joines stated that he never worked as a flagman for an extended period of time and that the longest continuous period during which he had driven Angle-Iron Flags into the ground was approximately one week. He also stated that erecting Angle-Iron Flags gave his shoulders a "workout" but that he had not suffered any ill effects to his shoulders. He opined that he could see how someone's shoulders would be affected after placing the Angle-Iron Flags by hand for a long period of time. When questioned regarding why he did not use a sledgehammer to drive Angle-Iron Flags into the ground, Mr. Joines stated that supervisors in his division, the Nashville Division, had told workers that they were not to hit metal on metal. He explained: "[I]f you have . . . a tool that you can strike with a sledgehammer, you're supposed to have a rubber grommet on the end of it to keep chips of metal that might break off from flying." When questioned regarding whether a two-handled post driver could be used to drive an Angle-Iron Flag into the ground, Mr. Joines opined that a post driver could only be used if the worker unbolted the sign from the flag first and then refastened it. He acknowledged that because he had not worked as a foreman flagman since 2005, he was not sure of the current procedure for erecting the flags.

Mr. Lackey testified that he had been employed with CSX since 1969 and that he had worked around Mr. McBee "occasionally." In his forty-four years with CSX, Mr. Lackey had worked in various positions but had been a foreman flagman for approximately ten years prior to his October 2013 deposition. His description of a foreman flagman's responsibilities corroborated that offered by Mr. McBee and Mr. Joines. Mr. Lackey stated that he knew Mr. McBee to be a good worker who got along with coworkers, followed supervisors' directions, and followed procedures. He

timeframe as Mr. McBee. The trial court did not address CSX's motion to exclude during the March 2014 hearing and subsequently granted summary judgment in favor of CSX without addressing the motion. On appeal, CSX has not raised an issue regarding the admissibility of Mr. Joines's testimony, and for purposes of our review, we note that Mr. Joines's deposition testimony was properly before the trial court for consideration upon CSX's motions for summary judgment. *See* Tenn. R. Civ. Pro. 56.04 (providing that in determining whether a moving party is entitled to judgment as a matter of law, the trial court shall consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . .").

acknowledged that he considered Mr. McBee a friend but that Mr. McBee had never complained to him about the procedure for erecting flags.

When questioned regarding the procedure he used to secure flags in the ballast or ground, Mr. Lackey explained:

[Y]ou've got to get them [the flags] in the ground deep enough where they'll hold up when they're – that wind doesn't blow them down. But you drive them – if you can't get them in the ground, you're in gravel and stuff, you take and you would drive them – you would take and you would take a sledgehammer and you would bam, bam (demonstrating). You'd drive them down far enough in the ground where they won't blow over.

According to Mr. Lackey, no supervisor had directed him regarding whether to use a sledgehammer to drive in the flags by hand. He stated that it was generally easier to drive in the flags with a sledgehammer but that it depended on the terrain. He also stated that in gravel or rock, "[y]ou've got to use a sledgehammer." He acknowledged that if the ground were very cold, he would need a sledgehammer to drive in the flags.

Mr. Lackey further testified that CSX required the flags to be placed four to five feet away from the train track on the engineer's side. He acknowledged that provided the foreman flagman maintained that width between the flag and the train track, the flagman would have approximately a one-half mile's length of discretion regarding where to place the flags because CSX required that the flags be erected between two and two and one-half miles from the start of the work. He further acknowledged that this discretion would sometimes allow the foreman flagman to choose softer ground in which to drive the flags. Mr. Lackey opined that whether Single-Bar Flags would be easier to drive into the ground than Angle-Iron Flags depended on the ground. He stated that by the time of his deposition, he used primarily flags that had been adopted by CSX in 2010, which had a hard rubber piece on top and were driven in with a sledgehammer.[7] Mr. Lackey acknowledged that CSX had never required him to erect flags by hand and that he had always understood it to be permissible to use a sledgehammer. He stated that he had never seen a specific written procedure for how the flag posts were to be driven into the ballast or ground. When questioned regarding whether it would be possible to use a two-

---

[7] Prior to the hearing on CSX's motions for summary judgment, CSX filed a motion *in limine* to exclude evidence of subsequent remedial measures pursuant to Tennessee Rule of Evidence 407. Specifically, CSX sought to exclude testimony describing and a drawing of the type of flag posts adopted in 2010. Again, the trial court did not address any motion to exclude during the March 2014 hearing and subsequently granted summary judgment in favor of CSX with consideration of the full record before it. *See* Tenn. R. Civ. Pro. 56.04.

handled post driver to drive in an Angle-Iron or Single-Bar Flag, Mr. Lackey stated that the flag posts were too tall for a post driver to be effective.

Mr. Land testified that by the time of his 2013 deposition, he had worked for CSX for over thirty-nine years. Mr. Land stated that he had worked around Mr. McBee and knew Mr. McBee to be a good and dependable worker who interacted well with his coworkers, listened to his supervisors' instructions, and knew his job. He acknowledged that he considered Mr. McBee a friend. Specifically, Mr. Land stated that he had been around Mr. McBee from 2007 to 2009 and was aware that when Mr. McBee worked as a foreman flagman, Mr. McBee was driving flag posts into the ballast or ground by hand. Mr. Land also testified that he had worked as a foreman flagman and had driven flag posts into the ground sometimes by hand and sometimes using a sledgehammer. He stated that the method he used depended on the ground and that if the ground were hard, the job was definitely easier using a sledgehammer.

Mr. Land further testified that he had erected flags by hand for approximately one month at a time but that when he was, for instance, "flagging a bridge," he was able to utilize holes in the ground that he had made previously. He acknowledged that a foreman flagman had discretion within a one-half mile distance as to where to place flags. According to Mr. Land, there was a point at which Mr. McBee and other foremen flagmen were told by CSX supervisors not to use sledgehammers to drive the flag posts into the ballast or ground because flying debris could injure workers. When questioned by CSX's counsel, Mr. Land denied that he had always been allowed to use a sledgehammer to drive flag posts into the ground or ballast. Mr. Land also stated that Single-Bar Flags had not always been available to all foremen flagmen. He acknowledged that he had never lodged any complaints with CSX regarding the procedure for erecting flags.

Upon reviewing the deposition testimonies of Mr. McBee's supervisor and coworkers, we conclude that as relevant to the negligence elements of foreseeability and causation, Mr. McBee has successfully established a genuine issue of material fact as to whether CSX informed him that he could use a sledgehammer to drive in the Angle-Iron Flags, and if not, whether CSX made the Single-Bar Flags available to him. We note also that according to Mr. McBee, CSX did not provide him with a sledgehammer during the relevant time period.

In support of his argument that he established a genuine issue of material fact, Mr. McBee relies in part on *Hardyman*, 243 F.3d 255, which we find instructive on this issue. In *Hardyman*, the plaintiff, a former conductor and brakeman filed a complaint against the defendant railroad, alleging that the railroad's negligence had resulted in his bilateral carpal tunnel syndrome. *Hardyman*, 243 F.3d at 257. The district court had granted the

railroad's motion *in limine*, excluding the plaintiff's proffered expert testimony. *Id.* On appeal, the Sixth Circuit determined that the district court had abused its discretion in excluding the plaintiff's expert witnesses as to causation. *Id.* at 267. However, the Sixth Circuit further determined that "even had the district court not abused its discretion in granting Norfolk's motion in limine, it does not automatically follow that summary judgment in favor of Norfolk was proper." *Id.* As the *Hardaway* court explained:

> Had we determined that the district court in fact did not abuse its discretion in excluding Plaintiff's expert causation testimony, nothing would preclude Plaintiff's treating physicians from testifying that Plaintiff did indeed have CTS [carpal tunnel syndrome] and as to what they have found, through their experience, generally has caused their patients to contract CTS, *i.e.,* what they have determined to be the diagnostic cause and effect. Furthermore, nothing would preclude expert testimony as to the generally accepted risk factors for the development of CTS, the number of risk factors and the degree to which each was present in Plaintiff's job, and the specific tasks required in each of Plaintiff's job requirements during the course of his employment with Norfolk. Finally, nothing would preclude Plaintiff from testifying as to his work and non-work-related activities. Such testimony, even without expert causation testimony, certainly would be adequate to provide a jury with the "special expertise . . . necessary to draw a causal inference." *See Claar v. Burlington N. R.R.,* 29 F.3d 499, 504 (9th Cir. 1994) (holding that expert testimony is necessary to establish causation in situations where "special expertise was necessary to draw causal inference").

*Id.* at 269. *See also Payne*, 467 S.W.3d at 456 (citing *Hardyman* with approval as "reversing trial court's ruling that plaintiff could establish causation only by showing a 'dose/response relationship' between exposure levels and risk of disease") (quoting *Hardyman*, 243 F.3d at 262).

Citing *Hardyman*, among others, CSX maintains that Mr. McBee has not been able to cite any appellate decisions that stand for the proposition, as CSX phrases it, that "expert evidence is not required to prove negligence when there are issues that are beyond the common experience and understanding of the average jury." We agree with this point as far as it goes. However, we determine that the effect on an employee's shoulders of driving seven-foot, angle-iron flag posts into the ground by hand eight times each day for months on end is within the common experience and understanding of the average jury, particularly if aided by testimony of a CSX supervisor and CSX workers who have performed the task and been aware of CSX's evolving procedures for doing so,

as well as testimony from treating physicians familiar with the employee's specific injuries.[8]

CSX further argues that even if this Court were to determine that expert testimony is not necessary to establish a genuine issue of material fact regarding CSX's alleged liability in this case, summary judgment would be warranted because Mr. McBee failed to present evidence that the practice of driving Angle-Iron Flags into the ballast or ground by hand was inherently unsafe. In support of this argument, CSX relies in part on this Court's decision in *Jennings v. Ill. Cent. R.R. Co.*, 993 S.W.2d 66 (Tenn. Ct. App. 1998), *perm. app. denied* (Tenn. May 10, 1999). We determine *Jennings* to be factually distinguishable from the instant action. The *Jennings* employee/plaintiff filed a FELA claim alleging that his disabling knee injury had been caused by the defendant railroad's negligence in maintaining maul hammers, used to drive spikes into railroad ties. *Jennings*, 993 S.W.2d at 68. The plaintiff's injury had occurred as the result of one incident when a dry-rotted maul handle broke and the iron maul head struck the plaintiff in the knee. *Id.* The plaintiff presented testimony from a coworker that maul handles were often left out in the weather by railroad employees and testimony from a safety expert who observed that hydraulic and automated alternative methods for driving spikes were available. *Id.* at 68-69. This Court affirmed the trial court's grant of summary judgment to the railroad upon determining that in order to find that the plaintiff had been injured because the particular spike maul he had been using had been left out in the weather, a fact finder would have to impermissibly "make an inference upon an inference." *Id.* at 71. As to the safety expert's testimony regarding alternative methods, this Court determined that courts previously had held that spike mauls were not an "inherently unsafe method" of driving spikes and that a railroad was not required to provide an alternative automated method of performing the task if the method used was not unsafe. *Id.* at 72.

In contrast, Mr. McBee has not alleged negligence stemming from a one-time accident or an inherently unsafe activity. He has alleged an injury arising from an extended time period of cumulatively performing a task without an allegedly necessary tool. We determine CSX's reliance on *Jennings* to be misplaced. Moreover, we note again the relaxed causation standard central to the purpose of FELA. *See, e.g., Wells v. Ill. Cent. R.R. Co.*, No. W2010-01223-COA-R3-CV, 2011 WL 6777921, at *8 (Tenn. Ct. App. Dec. 22, 2011), *perm. app. denied* (Tenn. Aug. 16, 2012) ("FELA does not require Wells to prove that her work activities or conditions were the sole cause of her condition,

---

[8] We note that in support of its argument that the issue of negligence in this case would be beyond the common experience and understanding of a jury, CSX has relied in part on appellate decisions from other states and federal district court decisions, both of which represent persuasive rather than controlling authority for this Court. *See Gossett*, 320 S.W.3d at 785 n.3; *Ottinger v. Stooksbury*, 206 S.W.3d 73, 78-79 (Tenn. Ct. App. 2006).

or even the primary cause. She need only establish that her injury 'result[ed] in whole or in part from the negligence of [the railroad].'") (quoting *May v. Ill. Cent. R.R. Co.*, No. W2010-01272-COA-R9-CV, 2011 WL 2361278, at *4 (Tenn. Ct. App. June 9, 2011)). We conclude that, taken in the light most favorable to Mr. McBee as we must at this stage in the proceedings, Mr. McBee presented competent evidence to create a genuine issue of material fact as to whether CSX negligently provided inadequate instructions, procedures, and tools for the task of erecting track flags such that CSX's negligence was at least a partial cause of Mr. McBee's bilateral rotator cuff injuries.

## V. Statute of Limitations

CSX contends that the trial court erred by denying its separate motion for summary judgment based on FELA's three-year statute of limitations. *See* 45 U.S.C. § 56 ("No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued."). As a procedural matter, we note that prior to this case coming before this Court on appeal, the trial court did not enter a written order memorializing its March 4, 2014 oral ruling denying the motion. Upon this Court's *sua sponte* order, the trial court entered an order on February 16, 2017, memorializing its oral ruling denying CSX's "Renewed Motion for Summary Judgment Based on the Three-Year Statute of Limitations." Also pursuant to this Court's order, the trial court clerk subsequently supplemented the appellate record with the order. *See* Tenn. R. App. P. 24(e) ("If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth."); *see, e.g., State v. Byington*, 284 S.W.3d 220, 223 (Tenn. 2009) (holding that dismissal of the appeal was not warranted based on the absence of a written order memorializing the trial court's oral denial of a motion for new trial, and directing that the intermediate appellate court should have ordered supplementation of the record with a written order disposing of the motion) (citing Tenn. Code Ann. § 27-3-128; Tenn. R. App. P. 24(e)).

Inasmuch as Mr. McBee commenced this action on June 21, 2010, the applicable three-year limitations period began to run on June 21, 2007. CSX argues that because Mr. McBee had been undergoing intermittent treatment for degenerative joint disease in his shoulders since 1999 and had been treated for probable tendonitis and bursitis of the shoulders in 2004 and 2005, his FELA claim began to accrue at that time. In the alternative, CSX argues that at the latest, Mr. McBee knew or should have known that his injury resulted from his employment when he sought treatment for left shoulder pain on February 19, 2007, after beginning to work as a foreman flagman again in January 2007. Mr. McBee contends that the trial court properly denied CSX's motion for summary judgment on this issue because his FELA claim for bilateral rotator cuff injuries did not accrue until 2008 when he "began experiencing a new, different, and increased type of

pain in his shoulders." Upon our thorough review of the record, we discern no error in the trial court's denial of summary judgment based on the statute of limitations.

Regarding accrual of a FELA claim, this Court has explained:

"Although 'accrual' of a cause of action, for the purposes of a statute of limitations, generally takes place 'when there has been a violation of legally protected interests,' or [']when the tortious event is committed,' some injuries and causes are so latent as to elude discovery at the time of the injury-causing event." *Fonseca v. Consol. Rail Corp.,* 246 F.3d 585, 588 (6th Cir. 2001) (quoting *Hicks v. Hines, Inc.,* 826 F.2d 1543, 1544 (6th Cir. 1987)). In order to determine when a FELA cause of action accrues, "one of two rules applies: the time-of-event rule, or the discovery rule." *Id.* The time of event rule ["]applies to situations in which a traumatic event occurs, resulting in a noticeable injury, even if the full manifestation of the harm remains latent." *Id.* The discovery rule applies "when no significant injury is discernable at the time of the tortious event, or if the cause of an injury is not apparent." *Id.* Under the discovery rule, the statute of limitations "begins to run as soon as the injured party is 'in possession of the critical facts' necessary to discover that a potential cause of action exists—namely, 'that he has been hurt and who has inflicted the injury.'" *Hensley v. CSX Transp., Inc.,* 278 S.W.3d 282, 288 (Tenn. Ct. App. 2008) (quoting *U.S. v. Kubrick,* 444 U.S. 111, 122 [100 S.Ct. 352, 62 L.Ed.2d 259] (1979)). "[A]n affirmative duty to investigate one's symptoms and their causes arises when a claimant 'should have known' that such an investigation was needed; in these cases, the statute of limitations will 'start . . . to run when a reasonable person would know enough to prompt a deeper inquiry.'" *Id.* (quoting *Nemmers v. United States,* 795 F.2d 628, 631 (7th Cir. 1986)). In other words, the cause of action is deemed to have accrued "when the plaintiff reasonably should have discovered both cause and injury." *Fonseca,* 246 F.3d at 588 (citing *Hicks,* 826 F.2d at 1544).

*May v. Ill. Cent. R.R. Co.,* 361 S.W.3d 511, 516 (Tenn. Ct. App. 2011), *perm. app. denied* (Tenn. Oct. 18, 2011) (quoting *Ward. v. Ill. Cent. R.R. Co.,* No. W2010-00950-R3-CV, 2011 WL 255146, at *4 (Tenn. Ct. App. Jan. 20, 2011)).

In this case, it is undisputed that no traumatic event occurred to cause Mr. McBee's bilateral rotator cuff injuries and that the discovery rule therefore applies. The question at hand is whether Mr. McBee knew or should have known prior to June 21, 2007, that he had suffered the injuries for which he seeks relief and that he had a potential cause of action due to CSX's alleged negligence in causing the injuries. The crux of

CSX's argument is that Mr. McBee's rotator cuff tears are part of a continuum of injury to his shoulders that began with the pain he originally complained of in 1999 and Dr. Coleman's early diagnoses of degenerative joint disease and arthritis. According to CSX, the rotator cuff tears were an exacerbation of an existing injury, in this case, one that existed at least as early as Mr. McBee's February 19, 2007 appointment with Dr. Coleman. As CSX notes, "'an aggravation of an original injury that is claimed to have been caused by an employer's negligence is not a severable action under the Federal Employers' Liability Act.'" *See Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 777 (6th Cir. 2001) (quoting *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 815 (6th Cir. 1996), *Aparicio* abrogated on other grounds by *Reeves v. Sanderson Plumbing Prods.*, 120 S.Ct. 2097 (2000)).

Mr. McBee argues, however, that the rotator cuff tears were new injuries he experienced in 2007 and 2008 after working as a foreman flagman for several months. He maintains that he initially believed in February 2007 that his arthritis was flaring up and that he did not connect the new, more severe shoulder pain he was experiencing to his responsibilities as a foreman flagman until February 2009 when Dr. Coleman referred him to Dr. Greco, who subsequently performed surgery and diagnosed bilateral rotator cuff tears.

This Court addressed a similar issue in *May*, wherein the plaintiff employee filed a FELA claim alleging that the defendant railroad's negligence had caused or contributed to the cause of the employee's bilateral carpal tunnel syndrome. *May*, 361 S.W.3d at 513. In May 2001, the employee had sought treatment from his physician, asking the physician directly if he believed that the "throbbing elbow, tingling hands, and some numbness" he was experiencing could be carpal tunnel syndrome. *Id.* The physician "told May that he was suffering from tendinitis and/or a deranged elbow and gave him a prescription for Vioxx." *Id.* When the symptoms did not resolve, the employee visited another physician, who diagnosed carpal tunnel syndrome and cubital tunnel syndrome, as well as opining that the employee's "problems were related to his work at the railroad." *Id.* The *May* employee underwent surgery on both hands in 2004 and filed his FELA lawsuit on April 22, 2005. *Id.*

Upon the railroad's motion for summary judgment based on the statute of limitations, the trial court in *May* denied the motion but granted permission for interlocutory appeal. *Id.* at 512. This Court affirmed the trial court's denial of summary judgment, concluding that although the employee had been on "inquiry notice that his symptoms may be work-related" in May 2001, the response he received to his inquiry from his first physician was "only that he had tendinitis and/or an unspecified derangement of his elbow." *Id.* at 517-18 ("Considering the record as a whole, we must agree with the trial court that a genuine issue of fact remains as to whether May knew or

should have known prior to [his second physician's] June 2002 diagnosis that his condition was work-related.").

In a line of FELA decisions, the Sixth Circuit has addressed the "distinction between the aggravation of a time-barred injury and a claim that is distinct from previous injuries." *Fonseca v. Consol. Rail Corp.*, 246 F.3d 585, 589 (6th Cir. 2001) (citing *Campbell*, 238 F.3d 772; *Aparicio*, 84 F.3d 803). In *Fonseca*, the Sixth Circuit explained:

> [W]e must decide if a genuine issue of material fact exists as to whether the symptoms that Fonseca [the employee] complained of within 3 years of his lawsuit is a separate injury from the symptoms that he experienced for the preceding 27 years. If, as Conrail [the railroad] argues, the continuous pain Fonseca experienced beginning in 1996 or 1997 was simply an aggravation of the prior decades of temporary discomfort, then Fonseca's claim is time-barred under *Aparicio* and *Campbell.* On the other hand, if the continuous pain and numbness that developed in the mid 1990s is a distinct injury from the normal discomforts of a day's work, as argued by Fonseca, then his cause of action may survive the statute of limitations defense. We need not decide which characterization of the injury is accurate; rather, we must simply determine whether the evidence is sufficient for a reasonable juror to find in favor of Fonseca. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ( "[T]he inquiry . . . is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

*Fonseca*, 246 F.3d at 590. The *Fonseca* court ultimately reversed the trial court's grant of summary judgment to the railroad upon determining that "there is nothing in Fonseca's testimony that allows us to conclude as a matter of law that a similar accumulation of the daily stresses of manual labor manifested themselves more than three years before he filed his complaint." *Id.* at 592.

Similarly, the task before us is to determine whether the evidence presents a sufficient disagreement as to require submission to a jury of the issue of whether Mr. McBee's bilateral torn rotator cuff injury was simply an aggravation of his previously diagnosed degenerative joint disease, tendonitis, or bursitis, or a new and distinct injury. In support of its original motion for summary judgment on this issue, CSX attached Mr. McBee's deposition testimony and medical records reflecting Mr. McBee's office visits with Dr. Coleman. In filing his response, Mr. McBee attached medical records reflecting his surgical and office records with Dr. Greco and referral communication between Dr.

Coleman and Dr. Greco. CSX subsequently attached to its renewed motion for summary judgment on this issue excerpts of deposition testimony offered respectively by Dr. Greco, Dr. Howard, and Dr. Dalal.

As demonstrated through Mr. McBee's medical records and Dr. Coleman's testimony, the following is a timeline of Mr. McBee's visits to Dr. Coleman's office during which Mr. McBee complained of shoulder pain prior to the referral to Dr. Greco:[9]

| | |
|---|---|
| April 26, 1999: | Mr. McBee was treated by Dr. Coleman, Sr., for bilateral crepitus, defined in part by Dr. Coleman [Jr.] during deposition as "an inflamed sensation," to movement of the shoulders with pain in his neck. Dr. Coleman, Sr., assessed Mr. McBee with degenerative joint disease of the shoulders and cervical osteoarthritis. |
| February 13, 2004: | Mr. McBee complained of bilateral shoulder pain "present now for the past 2 weeks and has been intermittent historically." Dr. Coleman observed "impingement with internal and external rotation" of the shoulders and pain present when Mr. McBee attempted to lift his arms above horizontal. Dr. Coleman assessed Mr. McBee with bilateral shoulder pain and prescribed Bextra as an anti-inflammatory. |
| January 14, 2005: | Mr. McBee complained of left upper arm pain that seemed to be worse when he lifted his arms above shoulder level. Dr. Mark C. Cooper, one of Dr. Coleman's partners, assessed Mr. McBee has having tendonitis in his left shoulder. Dr. Cooper prescribed Mobic as an anti-inflammatory after assessing Mr. McBee's right knee pain as well as left shoulder pain. |
| February 4, 2005: | Dr. Coleman saw Mr. McBee for a recheck of shoulder and knee pain and continued his prescription of Mobic. |
| February 19, 2007: | Mr. McBee complained of pain in his left shoulder and neck lasting for two weeks. Dr. Coleman assessed him with impingement on internal and external rotation |

---

[9] During these office visits, Mr. McBee was treated for other medical complaints and conditions as well.

30

with pain when he lifted his arms above horizontal. Dr. Coleman testified that upon this visit, he thought that Mr. McBee's left shoulder pain was "an exacerbation of the arthritis itself, a tendonitis or a bursitis."

November 20, 2008:  Mr. McBee complained of left shoulder pain that had been present for the past three to four months and had been alleviated somewhat by an over-the-counter medication. Dr. Coleman assessed him with shoulder pain and recommended an MRI.

February 4, 2009:  Mr. McBee complained of worsening pain in his left shoulder and difficulty using his left arm. Dr. Coleman assessed him with left shoulder pain and planned to set up an MRI of both shoulders and referral to an orthopedic surgeon pending MRI results.

February 18, 2009:  Dr. Coleman referred Mr. McBee to Dr. Greco, noting that attempts to obtain MRI scans had been unsuccessful.

During the hearing on CSX's renewed motion for summary judgment on this issue, CSX conceded that Dr. Coleman had not associated Mr. McBee's degenerative joint disease with rotator cuff tears through 2005. CSX asserted, however, that Dr. Coleman's February 19, 2007 diagnosis of "an exacerbation of the arthritis itself, a tendonitis or a bursitis" indicated a precursor to a rotator cuff tear that should have put Mr. McBee on notice that his shoulder injury was related to the work he had begun as a foreman flagman the prior month. During his deposition testimony, Dr. Coleman acknowledged that in February 2007, he began to consider the possibility that Mr. McBee could have a rotator cuff tear. He explained, however, that he concluded and still believed that if Mr. McBee's rotator cuff had been tearing at that point, "it would have progressed more rapidly and been more of an ongoing problem, or at least [Mr. McBee] would have reported it to [Dr. Coleman] more." Although Dr. Coleman acknowledged that he could not state with a reasonable degree of medical certainty that Mr. McBee's shoulder injuries were related to his work responsibilities, he opined that "sometime within the months preceding my referral to Dr. Greco is when there was a definitive tear." The record contains no indication that Dr. Coleman informed Mr. McBee of any suspicion regarding a rotator cuff tear during the February 19, 2007 office visit.

In his February 18, 2009 referral memorandum to Dr. Greco, Dr. Coleman stated:

31

Thank you for seeing Bobby. He is a 59-year-old gentleman who has had a history of bilateral shoulder pains off and on for several years. For the most part, he had been controlled with Mobic until more recently. There had been a few times when he has had exacerbations of tendonitis or bursitis that I have treated him with a Medrol Dosepak with results. Over the past four months, nothing has really helped and his left shoulder is becoming particularly more of a problem. I have tried to get an MRI of his shoulder done at the Open MRI here in Scottsboro as well [as] at the Huntsville Imaging Center, but he was too broad for the machine in both instances. He also did not feel like he could manage physical therapy with his work schedule, and I did not know where else to go with this.

Following his initial examination of Mr. McBee, Dr. Greco stated in a return memorandum dated February 23, 2009 in relevant part:

Thank you very much for allowing me the opportunity to see Bobby McBee who I saw in the office today on February 23, 2009. Bobby is having problems with his left shoulder. It looks like he is tired of dealing with it. It has been bothering him for about nine months. We are going to go ahead and take care of it surgically hopefully getting to it before he tears his rotator cuff off the bone. I will certainly keep you abreast of his progress.

In support of its argument that Mr. McBee's rotator cuff tears were an exacerbation of an existing condition, CSX cites Dr. Greco's deposition testimony that at the time he first operated on Mr. McBee in March 2009, the left rotator cuff had been torn for quite some time. In describing how a rotator cuff tear occurs, Dr. Greco stated:

Four tendons make the rotator cuff up, and they are the power of the shoulder underneath the deltoid. So, these tendons are very important. They attach four small muscles to the shoulder bone. They move the shoulder and they become—over time, they can become worn and tear.

* * *

[R]otator cuff tears are kind of—it's kind of [a] continuum. You start when you have painful should[er] with the rotator cuff, tendonitis—really, it should [be] tendenosis, and that's early degeneration. So I tell people you think of it like a—like a fan belt. The fan belt works and works and works and works. But if you look at it closely with a magnifying glass, you'd see

32

some micro tearing, and that's the same thing as the rotator cuff. It continues to work, continues to work, and then it starts—as it's attached to the ball, it starts onion skin peeling away, and then it—a partial tear becomes a full-thickness tear as—as it goes on and continues because the rotator cuff, those four tendons that we talked about earlier, have very poor blood supply.

Dr. Greco explained that at the time of the March 2009 procedure, Mr. McBee had suffered from a full-thickness tear of his left rotator cuff with a moderate retraction, meaning that the tear had been present for "a while." He stated that it "[t]akes a while for the rotator cuff to start pulling away from the bone." According to Dr. Greco, Mr. McBee also suffered a full-thickness tear of his right rotator cuff, confirmed by the August 2009 procedure to repair that shoulder. Dr. Greco testified that tendonitis (or tendenosis) and bursitis are precursors of rotator cuff tears. When questioned whether aging, diabetes, and excess weight were risk factors for developing rotator cuff tears, Dr. Greco answered in the affirmative.

In support of its position, CSX also cites Dr. Howard's testimony that Mr. McBee's rotator cuff tears were part of a "process." At Mr. McBee's counsel's request, Dr. Howard had performed an independent medical examination of Mr. McBee and reviewed pertinent medical records in November 2013. During Dr. Howard's deposition, the following exchange occurred:

> CSX's Counsel: Do you agree, Dr. Howard, that Mr. McBee's symptoms in 2007 and 2008, no matter what caused those symptoms, were an aggravation of earlier problems he had in his shoulders?

> Dr. Howard: In his particular case because they were total tears, yes, this was a process.

> CSX's Counsel: So it was an aggravation of earlier symptoms, you agree, correct?

> * * *

> Dr. Howard: No, no. I didn't say aggravation of—he had to have some—a rotator cuff tear—and we've already established that through your excellent questions before—this is a nonacute event. It is a chronic event. And so there's already some underlying pathology.

You don't have impingement syndrome and you don't tear the supraspinatus tendon one day without having at least impingement syndrome going on, damaging the tendon prior to that. So there had to be pre-existing conditions which were there which enabled the rotator cuff to completely tear.

So, yes, I'm saying that he had to have some rotator cuff pathology, but I'm not saying when it started. I know when it got worse and when the patient's pain got worse. And I know that in my medical opinion and common sense that pushing metal poles down into ballasts is clearly going to not help a rotator cuff; it will exacerbate a rotator cuff problem. And that is my medical opinion, and I feel very confident with that.

Although Dr. Howard testified that a diagnosis of degenerative changes in the shoulder can be a precursor to a rotator cuff tear, he emphasized that such a diagnosis is not always a precursor to a rotator cuff tear. Dr. Howard further testified that the diagnoses of tendonitis and bursitis have a correlative relationship to rotator cuff tears but do not necessarily lead to rotator cuff tears. Dr. Howard agreed with Dr. Greco that aging, diabetes, and excess weight were all risk factors for the development of rotator cuff tears.

Dr. Dalal also performed an independent medical examination of Mr. McBee in November 2013 at the request of Mr. McBee's counsel. In addition, Dr. Dalal reviewed Mr. McBee's medical records sent to him, but he testified that the earliest record he reviewed was dated February 23, 2009, the date of Dr. Greco's first examination of Mr. McBee. Dr. Dalal opined that the "repetitive activity" of "putting poles by the side of the road" caused Mr. McBee's shoulder injuries. He acknowledged that tendonitis and bursitis could be precursors of a rotator cuff tear. He also acknowledged that aging, diabetes, and excess weight were risk factors for rotator cuff tears, but he emphasized that injury would be the "number one cause of rotator cuff tear."

During CSX's counsel's argument in support of the subject motion, the trial court interjected the following:

[Mr. McBee] was seeing his treating doctor. What duty – I mean, if the doctor is saying this is my diagnosis and this is the problem, how do I – How do we take that out of the doctor's hands and say okay, Mr. McBee,

34

you need to – you should have questioned his diagnosis. You should have sat there and said there's something more here.

I mean, if the doctor is sitting there saying it's just . . . degenerative joint disease. That's the diagnosis and he's saying—if that's all he's being told, how do I change—how do I add to that duty to sit there and be like no, you need—you should have gotten a second opinion. And you should have said no, Doctor, there's something more here, and if you're not going to diagnose me right, I'm going to go find somebody else.

I mean, he did what he was supposed to do. He was seeing a doctor. I mean, if he sat there and said I just suffered in silence for the last ten years, you know, that would be one thing. But he—I mean, he was going to the—he was being treated. I mean, and if that doctor is sitting there saying this is what I think, how does that put him on notice that maybe there is a rotator cuff tear?

In denying the motion at the close of associated argument during the hearing, the trial court stated: "Hearing all the arguments of counsel and reading the extensive memoranda, I'm going to deny the renewed Motion for summary judgment based on three-year statute of limitations." The trial court thereby found that Mr. McBee had established a genuine issue of material fact regarding whether the FELA claim for his bilateral rotator cuff injury began to accrue within three years of his filing the complaint. We agree.

CSX's argument that Mr. McBee's rotator cuff tears were an aggravation of his previously diagnosed degenerative joint disease, tendonitis, and bursitis is supported by some evidence, including Dr. Greco's testimony that tendonitis and bursitis are precursors of rotator cuff tears. However, Dr. Howard and Dr. Dalal were each quick to clarify that the connection was a correlative rather than a causal one. Moreover, the issue in reviewing the trial court's denial of summary judgment must be determined by when Mr. McBee was on inquiry notice, whether he made an inquiry, and what he learned from his inquiry. *See May*, 361 S.W.3d at 517-18. When Mr. McBee sought treatment for shoulder pain in February 2007, one month after he had begun working again as a foreman flagman, he was diagnosed by Dr. Coleman with "an exacerbation of the arthritis itself, a tendonitis or a bursitis." Mr. McBee testified that when he felt more severe pain in his shoulders in 2008, he initially "figured it was arthritis again" and "went to the doctor then to find out." Dr. Coleman opined that Mr. McBee's rotator cuff tears occurred "sometime within the months preceding" Dr. Coleman's February 2009 referral to Dr. Greco.

Upon our careful review of the record, we determine that a genuine issue of material fact remains as to whether Mr. McBee knew or should have known prior to June 21, 2007, that his bilateral rotator cuff injury was related to his employment with CSX. The trial court did not err by denying CSX's motion for summary judgment on the basis of the applicable statute of limitations.

## VI. Conclusion

For the reasons stated above, we reverse the trial court's grant of summary judgment in favor of CSX on Mr. McBee's alleged inability to prove liability without expert testimony. We affirm the trial court's judgment in all other respects. This case is remanded to the trial court for further proceedings consistent with this opinion and collection of costs below. Costs on appeal are taxed to the appellee, CSX Transportation, Inc.

_____
THOMAS R. FRIERSON, II, JUDGE